UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   Plaintiff,<br>   v.<br>ALFONZO WILLIAMS,<br>   Defendant. | Case No. 13-cr-00764-WHO<br><br>**ORDER ON MOTIONS TO SUPPRESS CELL PHONE DATA OBTAINED PURSUANT TO SPRINT WARRANT, T-MOBILE WARRANT, AND JUNE 4, 2012 EXIGENT REQUEST**<br><br>Re: Dkt. Nos. 570, 583, 588 |

## INTRODUCTION

Defendant Antonio Gilton ("A. Gilton") moves to suppress all cell phone data unlawfully obtained under a warrant issued to his cell phone provider, Sprint, on June 6, 2012. Defendant Barry Gilton ("B. Gilton") moves to suppress all cell phone data unlawfully obtained pursuant to an exigent request to his cell phone provider, T-Mobile, on June 4, 2012, as well as all cell phone data unlawfully obtained under a warrant issued to T-Mobile on June 6, 2012. For the reasons discussed below, A. Gilton's motion to suppress is GRANTED, and B. Gilton's two motions to suppress are DENIED.

## BACKGROUND

On June 6, 2012, a judge of the Superior Court of California, County of San Francisco issued a warrant to Sprint for the seizure of cell phone records for the number 424-202-7921 (the "Sprint warrant"). The warrant identifies three categories of information for seizure: (1) subscriber and billing information; (2) all incoming and outgoing calls and texts from May 1, 2012 to June 6, 2012; and (3) cell site location information ("CSLI").

The affidavit submitted in support of the warrant is by San Francisco Police Department ("SFPD") Sergeant Gary Watts. It states that at approximately 2:00 a.m. on June 4, 2012, SFPD officers responded to a report of shots fired in the area of Meade and Le Conte Avenues and found

1    Calvin Sneed slumped in the driver's seat of a Toyota Corolla.  Sneed had a gunshot wound to his
2    head and was later pronounced dead.  His minor girlfriend was standing next to the vehicle.  She
3    told police that approximately eight months before the shooting she had left San Francisco for Los
4    Angeles to get a "new start" and had been staying with her "elder brother" in Los Angeles.  It is
5    undisputed that the "elder brother" is A. Gilton.

6        The girlfriend stated that she had met Sneed approximately four months before the
7    shooting.  She subsequently learned that Sneed was pimping young women in the Los Angeles
8    area, and she began to advertise herself on various prostitution websites.  On May 31, 2012, her
9    mother traveled to Los Angeles to attempt to persuade her to return to San Francisco.  On June 3,
10   2012, the girlfriend and Sneed drove to San Francisco and arrived at her parents' home at
11   approximately 4:00 p.m.

12       At approximately 12:30 a.m. on June 4, 2012, the girlfriend had an argument with her
13   mother about wanting to return to Los Angeles with Sneed.  She texted Sneed to pick her up from
14   her parents' home and "used her brother's cell phone charger to charge her phone."  At
15   approximately 1:49 a.m., she texted Sneed her parents' address.  At approximately 1:56 a.m., he
16   texted her to come outside.  Once outside, she noticed a silver SUV parked nearby with its lights
17   on.  Sneed arrived and drove past where the girlfriend was standing.  The SUV accelerated up to
18   Sneed's vehicle, and the girlfriend heard gunshots and saw "muzzle flash" coming from the SUV.
19   She ran up to Sneed's vehicle and found him slumped in the driver's seat with a gunshot wound to
20   his head.

21       The girlfriend allowed the police to search her cell phone.  During the search, the police
22   identified cell phone numbers for the girlfriend's father, mother, elder brother, and younger
23   brother, who was living at the parents' home at the time.  The girlfriend stated that the 424-202-
24   7921 number subsequently targeted in the Sprint warrant belonged to her elder brother.

25       Although the affidavit submitted in support of the Sprint warrant includes additional
26   information beyond that described above, there are no other references to A. Gilton.  Much of the
27   additional information concerns the girlfriend's father, B. Gilton.  Among other things, the
28   affidavit describes CSLI for B. Gilton's cell phone obtained by the SFPD pursuant to an exigent

request to T-Mobile on June 4, 2012.  The affidavit states that, according to the CSLI, B. Gilton's cell phone was moving around San Francisco, including in and around the Western Addition neighborhood, between 12:49 a.m. and 2:19 a.m. on June 4, 2012.  The affidavit also notes that, after the shooting, B. Gilton told the police that he had returned to his house at approximately 12:15 a.m. and gone to his bedroom.

The same Superior Court judge who issued the Sprint warrant also issued another warrant on June 6, 2012, this one to T-Mobile for the cell phone records of B. Gilton (the "T-Mobile warrant").  The T-Mobile warrant identifies the same three categories of information and the same date range for seizure as the Sprint warrant.  The affidavit submitted in support of the T-Mobile warrant is also by Sergeant Watts; with limited exceptions not relevant here, it is identical to the affidavit submitted in support of the Sprint warrant.

The Second Superseding Indictment charges A. Gilton and B. Gilton in four of its 22 counts: (1) Count One, conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity in violation 18 U.S.C. § 1962(d); (2) Count Two, murder in aid of racketeering of Calvin Sneed in violation of 18 U.S.C. § 1959(a); (3) Count Three, use of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A); and (4) Count Four, use of a firearm in murder in violation of 18 U.S.C. § 924(j).  Dkt. No. 139 ¶¶ 1-25.  I heard argument on December 17, 2015 and January 8, 2016.  Dkt. Nos. 742, 796.

**LEGAL STANDARD**

The Fourth Amendment protects against unreasonable searches and seizures and requires that warrants be issued only upon a showing of probable cause.  U.S. Const. Amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").  Searches and seizures in violation of the Fourth Amendment are unlawful, and evidence obtained as a result is considered "fruit of the poisonous tree" and is inadmissible under the exclusionary rule.  *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013); *see also United States v. Underwood*, 725 F.3d 1076, 1083-84 (9th Cir. 2013).

**DISCUSSION**

**I.   A. GILTON'S MOTION TO SUPPRESS CELL PHONE DATA OBTAINED UNDER THE SPRINT WARRANT**

In his opening brief, A. Gilton argued that the affidavit in support of the Sprint warrant failed to establish probable cause to seize his cell phone data, and that the affidavit was so lacking in indicia of probable cause that the good faith reliance exception could not be applied. Dkt. No. 570 at 5-8. The government responded (1) that A. Gilton had not established that the 424-202-7921 number belonged to him; (2) that A. Gilton had no reasonable expectation of privacy in the seized cell phone data; (3) that the warrant was supported by probable cause; and (4) that the police relied in good faith on the warrant. Opp. at 6-15 (Dkt. No. 677). Then, the day after A. Gilton filed his reply brief, the government submitted a "supplemental opposition brief" arguing that the seizure of the cell phone data was also covered by the inevitable discovery doctrine. Suppl. Opp. at 1 (Dkt. No. 723). I address each of the government's arguments below.

**A.   Ownership of Cell Phone Number**

There is no serious dispute that the cell phone number targeted by the Sprint warrant belonged to A. Gilton. Even assuming that this fact was not clear from the outset, A. Gilton submitted a declaration in conjunction with this reply brief stating that from May 1, 2012 to June 6, 2012, he owned and used an Apple iPhone with the number 424-202-7921, and that the service provider for the cell phone was Sprint. A. Gilton Decl. ¶ 3 (Dkt. No. 709-1). The government does not dispute that this adequately establishes that the number belonged to A. Gilton.

**B.   Reasonable Expectation of Privacy**

The government contends that A. Gilton had no reasonable expectation of privacy in the CSLI he seeks to suppress. *See* Opp. at 6-11.[1] This issue was recently addressed by the Hon. Lucy H. Koh and the Hon. Susan Illston, both of whom concluded that an individual does have a reasonable expectation of privacy in his or her historical CSLI. *See In re Application for Tel. Info.*

---

[1] The government does not dispute that A. Gilton has a reasonable expectation of privacy in the contents of his incoming and outgoing text messages. *See* Opp. at 6 n.2, 14 n.6. A. Gilton does not dispute that he lacks a reasonable expectation of privacy in his subscriber and billing information and the records of incoming and outgoing calls. *See* Reply at 3 n.1.

4

*Needed for a Criminal Investigation*, No. 15-cr-90304-LHK, 2015 WL 4594558, at *7-12 (N.D. Cal. July 29, 2015) (on appeal); *United States v. Cooper*, No. 13-cr-00693-SI, 2015 WL 881578, at *6-8 (N.D. Cal. Mar. 2, 2015). I do the same in the Order Denying Motions to Suppress Regarding Cell Site Location Information that I am issuing today in this case. The government offers no persuasive reason in its briefing on the instant motions to depart from this approach, and I follow it here. Gilton had a reasonable expectation of privacy in the historical CSLI obtained under the Sprint warrant.

### C. Probable Cause and Good Faith Reliance Exception

"A search warrant is supported by probable cause if the issuing judge finds that, given all the circumstances set forth in the affidavit before him[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Underwood*, 725 F.3d at 1081 (internal quotation marks omitted). This standard does not require the affidavit to establish that the evidence is in fact in the place to be searched, or that it is more likely than not to be there. *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004). The issuing judge "need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Id.* (internal quotation marks omitted). An issuing judge's finding of probable cause is entitled to "great deference" and is reviewed only for "clear error." *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011). Nevertheless, a reviewing court could should find that a warrant is unsupported by probable cause where "the issuing judge lacked a substantial basis for concluding that probable cause existed." *Underwood*, 725 F.3d at 1081 (internal quotation marks and alterations omitted).

The affidavit submitted in support of the Sprint warrant plainly failed to provide a substantial basis for concluding that there was probable cause to search A. Gilton's cell phone records. The affidavit hardly mentions A. Gilton. It states only that the girlfriend lived with him in Los Angeles, and that his number was one of those in the girlfriend's cell phone. These passing, innocuous references to A. Gilton constitute the only information about him in the affidavit. The affidavit does not even assert, or provide a substantial basis for inferring, that A. Gilton was in the San Francisco area at the time of the shooting. The girlfriend told the police that

5

1     she "used her brother's cell phone charger to charge her phone," but there is no indication that she
2     was referring to A. Gilton's charger as opposed to her younger brother's, who, according to the
3     affidavit, was then living at the parents' home.

4         The government contends that the facts stated in the affidavit were sufficient to establish
5     probable cause because they showed that the girlfriend met Sneed while living with A. Gilton in
6     Los Angeles. Opp. at 12. The government further emphasizes that the totality of the
7     circumstances reflected in the affidavit "pointed to the murder being a family-based attack." *Id.* I
8     am not convinced. While the affidavit indicates that the girlfriend was living with A. Gilton when
9     she met Sneed, there is no indication that A. Gilton was in San Francisco at the time of the
10     shooting, that he had any connection to the parents' home nearby to where the shooting took
11     place, or that he had communicated with family members (or anyone else) about the girlfriend's
12     relationship with Sneed. And, even assuming that the government is correct that the facts stated in
13     the affidavit supported a reasonable inference of a "family-based attack," those facts pointed to
14     one particular family member being involved in the attack: B. Gilton, not A. Gilton.

15         The government argues that in *United States v. Foster*, 711 F.2d 871 (9th Cir. 1983), the
16     Ninth Circuit upheld a warrant "based on similar inferences" as those the government relies on
17     here. Opp. at 12. That is not an accurate characterization of *Foster*. The affidavit in that case
18     disclosed that a codefendant "headed a major heroin distribution ring," that narcotics had been
19     viewed at the codefendant's residence on several occasions, and that the defendant was a
20     lieutenant in the codefendant's distribution ring. 711 F.2d at 878-79. The affidavit also detailed
21     multiple narcotics sales by the defendant and included a narcotic agent's opinion that, in light of
22     his experience, "he believed that evidence of the defendants' drug dealings would be found at
23     [their] residences." *Id.* at 878. Based on these facts, the Ninth Circuit concluded that the affidavit
24     provided probable cause to search the defendant's home. *Id.* at 879.

25         This case is not like *Foster*. There is no common link here to a "major heroin distribution
26     ring" or similar entity. The fact that A. Gilton is a member of the Gilton family, in particular with
27     hardly any information in the affidavit regarding the history or activities of that family, is nowhere
28     close to analogous to the defendant in *Foster* being a lieutenant in a major drug distribution

organization. There is nothing in the affidavit indicating that A. Gilton had previously been involved in crimes similar to the one being investigated (or any crimes at all). Nor is there an opinion from an investigating officer stating that, based on his or her experience in similar cases, he or she believed that evidence of the homicide would be found in A. Gilton's cell phone data. Sergeant Watts did not state, for example, that based on his training and experience with other cases involving the killing of a minor's boyfriend, he believed that evidence of the killing would be found in the minor's relative's cell phone data. Rather, he stated that "based on [his] investigation, there appears to be probable cause to believe that the cell phone numbers provided will tend to show [sic] has possible first-hand knowledge of those persons responsible for the shooting of the [sic] Calvin Sneed that took place in San Francisco on 12/20/11 [sic], and that the results of the [search and seizure] could possibly lead to the proper identity and the whereabouts of additional persons associated with this crime." *Foster* does not help the government's case.

*United States v. Grant*, 682 F.3d 827 (9th Cir. 2012), cited by A. Gilton, is closer to the mark. There, the police obtained a warrant to search the defendant's home for the purpose of recovering, among other evidence, a gun and ammunition used in a homicide that had occurred nearly nine months earlier. *Id.* at 828. There was no indication that the defendant had been personally involved in the homicide, but the police suspected that two of his sons, Davonte and James, had some connection to it. *Id.* The Ninth Circuit held that the warrant affidavit was insufficient to establish either probable cause or an adequate basis for application of the good faith reliance doctrine. It acknowledged that the affidavit supported a reasonable inference that Davonte possessed the gun at some point but found that there were no facts indicating that Davonte had brought the gun to the defendant's home. *Id.* at 832-33. Similarly, while the affidavit indicated that James had visited the defendant's home at some point following the homicide, it failed to establish any plausible connection between James and the gun. *Id.* at 833. The Ninth Circuit concluded that the affidavit "simply does not set out any plausible connection between [defendant's] home and the gun or ammunition used in the homicide," and, as such, failed to establish even a "colorable argument for probable cause." *Id.* at 836, 841 (internal quotation marks omitted).

The connection set out in the affidavit between A. Gilton and the Sneed shooting is not materially stronger than the purported connection rejected by the Ninth Circuit in *Grant*. Here also, the facts stated in the affidavit are focused largely on a family member (B. Gilton) as opposed to A. Gilton himself, and the government's proffered route to a finding of probable cause requires inferences that are "entirely speculative" based on the actual information in the affidavit. *See Grant*, 682 F.3d at 639. As discussed above, the notion that the affidavit supported a reasonable inference of a "family-based attack" does not create a plausible connection between A. Gilton and the shooting given that there was no indication in the affidavit that any particular family member other than B. Gilton had been involved, or that A. Gilton was even in or around San Francisco on or around June 4, 2012.

This raises the question of whether the good faith reliance exception applies here. Under the good faith reliance exception, suppression of evidence seized under a warrant unsupported by probable cause is not appropriate if the government relied on the warrant in "good faith." *Grant*, 682 F.3d at 836. Suppression remains an appropriate remedy, however, if the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal quotation marks omitted). "An affidavit is so lacking in indicia of probable cause . . . when it fails to provide a colorable argument for probable cause." *Underwood*, 725 F.3d at 1085. A "colorable argument for probable cause" is one that would allow "thoughtful and competent judges" to disagree over whether probable cause exists. *Id.* (internal quotation marks omitted). "The burden of demonstrating good faith rests with the government." *Id.*

The affidavit submitted in support of the Sprint warrant does not provide a basis for application of the good faith reliance exception. For all the reasons stated above, it was "entirely unreasonable" to believe that the affidavit's passing, innocuous references to A. Gilton established probable cause to obtain his cell phone data. *Grant*, 682 F.3d at 836. The Sprint warrant does not justify the seizure of the data.

### D. Inevitable Discovery Doctrine

The government's final argument, raised for the first time in its supplemental opposition brief, is that the seizure of A. Gilton's cell phone data is excused under the inevitable discovery

doctrine. *See* Suppl. Opp. at 1. The inevitable discovery doctrine creates an exception to the exclusionary rule where the government establishes by a preponderance of the evidence that the unlawfully obtained information inevitably would have been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984). The government contends that the doctrine is properly applied here because on June 20, 2012, two weeks after the Sprint warrant was issued, SFPD Lieutenant William Braconi met with FBI Agent Jacob Millspaugh, who was pursuing his own preexisting investigation of the Central Divisadero Players. Through this meeting with Agent Millspaugh, Lieutenant Braconi viewed video footage taken the night of the Sneed shooting that depicted B. Gilton and A. Gilton obtaining a firearm just prior to the shooting and then entering a silver SUV that matched the description of the vehicle used in the shooting and that had been rented to A. Gilton's girlfriend. Lieutenant Braconi states in a declaration that "[b]ased on this information, I would have obtained a search warrant for Barry Gilton's and Antonio Gilton's cellular telephone records if we had not already obtained the warrant for those . . . records on June 6, 2012."

There are at least two problems with the government's reliance on the inevitable discovery doctrine here. The first is that it runs into the Ninth Circuit's repeated refusal to apply the doctrine "to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant." *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (internal quotation marks omitted); *accord United States v. Young*, 573 F.3d 711, 723 (9th Cir. 2009); *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000); *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995); *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986). "If evidence were admitted notwithstanding [an] unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason . . . to seek a warrant." *Camou*, 773 F.3d at 943 (internal quotation marks omitted; emphasis in original). This would "in effect eliminate the warrant requirement." *Mejia*, 69 F.3d at 320.

The government contends that this principle is inapplicable in this case because the SFPD did attempt to obtain a warrant, and in fact obtained one. *See* Second. Suppl. Opp. at 3-4 (Dkt. No. 757). I agree with A. Gilton that this is a distinction without a difference given the Sprint

warrant's plain failure to establish probable cause. While application of the inevitable discovery doctrine in this case might not effectively obviate the entirety of the Fourth Amendment warrant requirement, it would effectively endorse the practice of prematurely seeking a deficient "placeholder" warrant in the hope of obtaining a warrant that, while deficient, could be cured by subsequently discovered evidence. The concern underlying the line of Ninth Circuit cases cited above is that application of the inevitable discovery doctrine would encourage police to circumvent the warrant requirement, anticipating that the unlawfully obtained evidence will ultimately be saved from exclusion under the doctrine. That concern remains present despite the SFPD's application for and receipt of a plainly defective warrant.[2]

The second problem with application of the inevitable discovery doctrine in this case has to do with when and how Lieutenant Braconi learned of the allegedly probable-cause-establishing video footage. The government titles a section of its second supplemental opposition brief, "Federal Courts Throughout the Country Have Applied [the Inevitable Discovery Doctrine] to Analogous Facts," and cites thirteen cases it contends applied the doctrine in circumstances similar

---

[2] *State v. Handtmann*, 437 N.W.2d 830 (N.D. 1989), while obviously not controlling, is instructive on this point. There, as here, the government relied on the inevitable discovery doctrine in an attempt to excuse a search conducted pursuant to a warrant unsupported by probable cause. *Id.* at 836. The government argued that application of the doctrine was appropriate based on later discovered evidence and an officer's testimony that if the defective search warrant "had not been obtained when it was, he would have appeared before the magistrate later that day and presented the additional evidence in an application for a warrant to search the defendants' house." *Id.* The North Dakota Supreme Court declined to apply the doctrine, reasoning that the government's

> assertion that it would have obtained a lawful search warrant based upon the information subsequently discovered would emasculate the requirement for a search warrant under the Fourth Amendment . . . We have said that the inevitable discovery doctrine may not be applied to encourage shortcuts by law-enforcement officials which eliminate a neutral and detached magistrate's probable-cause determination . . . Application of the inevitable-discovery doctrine in this case would encourage law-enforcement shortcuts whenever evidence may be more readily obtained by unlawful means – a result at odds with the purpose of the exclusionary rule to deter police from obtaining evidence in an illegal manner. Moreover, judicial sanctioning of the doctrine in this case would also encourage incomplete police investigations in the hope that information subsequently discovered would cure a defective warrant.

*Id.* at 838.

to those at issue here. *See* Second Supp. Opp. at 4-5, Appx. A. But as the government surely knows based on its apparently extensive research of the issue, application of the doctrine in this case would be an unusual, if not unique, occurrence. In each of the thirteen cases the government cites, the relevant law enforcement officials were in possession of the theoretically probable-cause-establishing information *at the time of the illegal search. See, e.g., United States v. Christy*, 739 F.3d 534, 540-44 (10th Cir. 2014) (search warrant inevitably would have issued where an investigating officer "had sufficient probable cause to obtain a warrant based on the information he had before the [sheriff's] deputies searched [the defendant's] residence"); *United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012) ("It is unreasonable to think that, after [the defendant] admitted [just before the challenged search] that he had child pornography, the FBI would have failed to follow up and obtain a search warrant."); *United States v. Warford*, 439 F.3d 836, 840, 844 (8th Cir. 2006) (search warrant inevitably would have issued based on aerial observations, made just before the challenged search, of marijuana growing outside the defendant's home); *United States v. Procopio*, 88 F.3d 21, 26-27 (1st Cir. 1996) (federal agents inevitably would have obtained a search warrant where, at the time of challenged search, the police "knew that [the defendant] was the object of a federal robbery investigation," and the defendant "made a blatant attempt to flee from the police when stopped for a minor traffic violation"). The government has not cited, and I have not found, a single federal case applying the inevitable discovery doctrine based on the assumption that, armed with evidence obtained two weeks (or a comparable period of time) after the illegal search, the police would have sought and received a valid warrant. This includes jurisdictions that, unlike the Ninth Circuit, allow the doctrine to excuse an illegal search on the theory that a warrant would have been obtained but for the illegal search. Even under the law of those jurisdictions, application of the inevitable discovery doctrine in this case would reflect a significant expansion of the doctrine.[3]

---

[3] At oral argument, the government attempted to neutralize the time gap between the Sprint warrant and the June 20, 2012 meeting between Lieutenant Braconi and Agent Millspaugh by arguing that probable cause did exist at the time of the Sprint warrant, in that the video footage of A. Gilton and B. Gilton was captured by an FBI pole-camera on the night of the shooting. But the government's inevitable discovery theory is that Lieutenant Braconi / the SFPD would have inevitably used the video footage to obtain a warrant, not that the FBI would have done so. There

11

The time gap between the Sprint warrant and the June 20, 2012 meeting between Lieutenant Braconi and Agent Millspaugh is also problematic in that the government has declined to produce any evidence regarding whether the same cell phone data would have been obtained had the seizure occurred on or around June 20, 2012. A. Gilton squarely raises this point in his briefing, noting that the government has provided "no evidence that [his] cell phone data would have still been retrievable from Sprint when Lieutenant Braconi obtained a valid warrant based on probable cause." Dkt. No. 724 at 4 n.1; *see also* Dkt. No. 756 at 4 ("[W]e are left to speculate as to whether [A. Gilton's] cell phone data would still have been obtainable from Sprint on whatever date the warrant would have been served."). I raised the same issue in my tentative ruling prior to the December 17, 2015 hearing. *See* Dkt. No. 733. Yet the government's only response is that it "strains common sense" to question whether Sprint would have destroyed the data in such a short period of time. *See* Second Suppl. Opp. at 3 n.1. Perhaps it is obvious to persons with specialized knowledge of the cellular telephone industry whether all of the seized data still would have been available on June 20, 2012 (or whenever the hypothetical warrant would have been executed).[4] But my own common sense – and, I would guess, the common sense of most people – provides no insight into this issue, leaving me to speculate as to the continued availability of the seized data. *See Nix*, 467 U.S. at 444 n.5 ("[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment."); *accord United States v. Ruckes*, 586 F.3d 713, 719 (9th Cir. 2009); *Young*, 573 F.3d at 722.

In addition, the government offers no explanation of why Lieutenant Braconi met with Agent Millspaugh on June 20, 2012. Lieutenant Braconi's declaration is silent on this point, and although A. Gilton raises the issue in his briefing, *see* Dkt. No. 756 at 5 n.2, the government does not address the issue at all in its second supplemental opposition brief. The inevitable discovery

---

is no indication that Lieutenant Braconi or anyone else from SFPD (or anyone from the FBI, for that matter) was aware of what the video footage depicted at any time before June 20, 2012.

[4] The June 20, 2012 date assumes that Lieutenant Braconi would have sought, obtained, and executed the warrant on the same day as his meeting with Agent Millspaugh. Lieutenant Braconi does not state in his declaration, and the government identifies no particular reason to believe, that Lieutenant Braconi would have done so.

United States District Court
Northern District of California

doctrine "requires that the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *United States v. Boatwright*, 822 F.2d 862, 864-65 (9th Cir. 1987); *accord United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989). To the extent that Lieutenant Braconi met with Agent Millspaugh as a result of the data obtained under the Sprint warrant – something that is more than plausible based on the current record – the government's inevitable discovery theory clearly fails.

The inevitable discovery doctrine is reserved for situations where the exclusionary rule's "deterrence rationale has so little basis that the evidence should be received," *Nix*, 467 U.S. at 444, and where "inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is [an] entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case," *Boatwright*, 822 F.2d at 864. The government has not shown that his case presents one of those situations. The doctrine does not apply here.

A. Gilton's motion to suppress is GRANTED.

**II.   B. GILTON'S MOTIONS TO SUPPRESS CELL PHONE DATA OBTAINED PURSUANT TO THE JUNE 4, 2012 EXIGENT REQUEST AND THE T-MOBILE WARRANT**

B. Gilton's two motions to suppress, on the other hand, are DENIED. The basic argument underlying the motions is that the June 4, 2012 exigent request was unjustified, and that the affidavit for the T-Mobile warrant improperly relied on the information gleaned from the request. Where a search warrant affidavit includes unlawfully obtained information, the court must "purge[] the affidavit of the offending facts and examine[] whether the remaining facts still afford[] a substantial basis for concluding that the search warrant was supported by probable cause." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001); *see also United States v. Duran-Orozco*, 192 F.3d 1277, 1281 (9th Cir. 1999) ("strik[ing] the final sentence of the application for the search warrant because that sentence was the result of the warrantless unjustified search," and "look[ing] at the remainder of the application" to assess whether it still furnished probable cause). Even assuming, without deciding, that the June 4, 2012 exigent request to T-Mobile was improper and excising the information gleaned from the request, the T-Mobile warrant affidavit still afforded a substantial basis for concluding that there was probable cause to

13

obtain B. Gilton's cell phone records. The informant's tip received on June 5, 2012 and recounted in the affidavit was anonymous, but it revealed considerable detail regarding the Sneed shooting as well as the source of the informant's knowledge. Combined with the other lawfully obtained information in the affidavit, it established a "reasonable nexus" between the shooting and the cell phone data sought under the T-Mobile warrant. *United States v. Crews*, 502 F.3d 1130, 1136-37 (9th Cir. 2007) ("For probable cause, an affidavit must establish a reasonable nexus between the crime or evidence and the location to be searched.").

I also find that, given the seriousness of the crime and the other lawfully obtained information in its possession at the time, the SFPD would have sought and obtained the T-Mobile warrant even had it not made the June 4, 2012 exigent request.[5] *See Murray v. United States*, 487 U.S. 533, 542-43 (1988); *United States v. Hill*, 55 F.3d 479, 481 (9th Cir. 1995). The information obtained pursuant to the exigent request and the T-Mobile warrant will not be suppressed.

## CONCLUSION

For the foregoing reasons, A. Gilton's motion to suppress is GRANTED, and B. Gilton's two motions to suppress are DENIED.

**IT IS SO ORDERED**.

Dated: February 9, 2016



WILLIAM H. ORRICK
United States District Judge

---

[5] Notably, although the SFPD received the cell phone data under the exigent request on June 4, 2012, it did not seek the T-Mobile warrant until June 6, 2012, after, among other things, receiving the informant's tip.

14