UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ALFONZO WILLIAMS,<br><br>    Defendant. | Case No. 13-cr-00764-WHO<br><br>**ORDER ON GOVERNMENT'S GANG EXPERT TESTIMONY** |

## INTRODUCTION

This Order concerns the proposed expert testimony of San Francisco Police Department ("SFPD") Sergeant Damon Jackson, the government's gang expert in this RICO prosecution of ten alleged members of the Central Divisadero Players ("CDP").[1] Sgt. Jackson will be allowed to provide expert testimony about the existence of the various gangs in the Western Addition[2] and their respective territories, and about certain common slang terms. The rest of his proposed expert testimony will be excluded from the government's case in chief. In the event that defendants' experts testify on topics beyond the scope of Sgt. Jackson's expert testimony in the government's case in chief, I will consider allowing him to provide additional expert testimony in rebuttal. Nothing in this Order limits Sgt. Jackson's testimony as a fact witness as long as there is an appropriate evidentiary basis for it.

## BACKGROUND

After the government revised its initial, inadequate disclosure of Sgt. Jackson's opinions, defendants submitted a series of motions challenging the proposed testimony described in the

---

[1] An eleventh defendant, Lupe Mercado, is not alleged to be a member of CDP.

[2] The government occasionally refers to the relevant neighborhood as the "Western Addition/Fillmore." For ease of reference, I use "Western Addition" in this Order.

revised disclosure. *See* Dkt. Nos. 634, 643, 651. Following oral argument on January 22, 2016, I issued an Order narrowing the scope of Sgt. Jackson's proposed testimony but recognizing that he could be qualified to give expert opinions regarding symbols, code words, colors, tattoos, territory mapping, and possibly also "characteristics of gangs in general . . . that would be helpful background for jurors." Dkt. No. 836 at 3 ("Prior Order"). I directed the government to file another revised disclosure for Sgt. Jackson's proposed testimony. *Id.* at 3-4. The government subsequently filed a Supplemental Notice Regarding Gang Expert ("Supplemental Notice") listing the following 43 opinions from Sgt. Jackson:

> 1. During the time period alleged in the Second Superseding Indictment, there were a number of African American gangs in the Western Addition/Fillmore, a/k/a "the Moe," neighborhood of San Francisco, California. These gangs could generally be divided into two groups: "Uptown" gangs and "Downtown" gangs. Within each of these groups were different gangs which claimed different territory and identified themselves in different ways.
>
> 2. Central Divisadero Players ("CDP") generally claimed the area from Divisadero Street to Central Avenue and from Fulton Street to Hayes Street (referred to as the "D" to mean Divisadero or CDP territory).
>
> 3. Knock Out Posse ("KOP") generally claimed the area from Turk Street to Ellis Street and from Steiner Street to Pierce Street. "KO" or "The O" is common slang for KOP territory.
>
> 4. Chopper City generally claimed the area from Scott Street to Divisadero Street and from Turk Street to Eddy Street. A "Chopper" or a "Chop" is common slang for an assault rifle type firearm. "The Chop" is also a common slang term for Chopper City territory.
>
> 5. 800 Block claimed from Webster to Buchanan and from Fulton to Grove.
>
> 6. "Uptown" gangs generally claimed territory in the western parts of the Western Addition, West of Fillmore. "Downtown" was geographically East of Fillmore. Not all gangs that were geographically within "Downtown" claimed "Downtown" in terms of the historic rivalry between Uptown and Downtown. For example, Page Street and 800 Block were East of Fillmore but generally aligned with Uptown.
>
> 7. Historically, Uptown gangs and Western Addition gangs aligned with Uptown gangs included CDP, KOP, Chopper City, Turkwood, 800 Block, and Page Street.
>
> 8. "Downtown" gangs generally claim territory in the eastern parts of the Western Addition.

9. Historically, "Downtown" gangs included Eddy Rock which claimed territory from Laguna Street to Buchanan Street and from Turk Street to Willow Street. Eddy Rock has also been referred to in the past as "OC," which stands for "Outta Control" and "PB," which stands for "Paypa Bound."

10. "Uptown" gangs and "Downtown" gangs were generally rivals but throughout the period in the Second Superseding Indictment, rivalries and violence between different factions shifted at different times.

11. Following a murder in 2005 of Skyler Stewart and a murder in 2006 of Aubrey Abrakasa, a/k/a "Chedda Boy" or "Chedda," the rivalry and violence between Uptown and Downtown gangs intensified.

12. Beginning in August 2008, KOP and CDP, which were both Uptown gangs, became rivals against each other and, at the same time, continued to be enemies of Downtown.

13. "Uptown" and "Downtown" gangs used a variety of symbols, including certain hand signals, codes, and tattoos, which Sgt. Jackson can describe. These symbols may appear in a variety of contexts, including email addresses, online monikers, rap songs, and graffiti or "tags," as well as in coded communications. "Uptown" and "Downtown" gangs commonly used rap music as a way of communicating messages to each other and to rivals (for example to brag about past exploits or issue threats, particularly when certain gangs were "beefing," or in conflict with each other).

14. For example, the symbol for "Uptown" is two thumbs up with the fists connected.

15. The symbol for "Downtown" is two thumbs down with the fists connected.

16. A hand signal with cupped hand or hands was used to symbolize CDP.

17. In addition, the numerical sequence "237" is one code for CDP. "237" refers to the numbers on a telephone key pad where the letters CDP may be found.

18. Similarly, "567" was code for KOP, "894" was code for Turkwood, "778" was code for Page Street and "223" was code for Chopper City.

19. "Banga" is a slang term frequently identified with and/or used in reference to CDP members.

20. "Bangers" is a common slang term for firearms. Similar common slang terms for handguns include "Strap, "thing" or "thang," "hammer," "tool," "40," "45," and "9."

21. An individual who "got bodies" or "has bodies" is common

slang for having committed a homicide.

22. A firearm that "has bodies on it" is common slang for a firearm being involved in a homicide.

23. "To get smacked" or "knocked down" are common slang for being murdered.

24. "To feed" or "get fed" is common slang meaning to shoot or get shot.

25. "Smash off" is common slang for leaving rapidly.

26. "20 shots" is common slang for crack cocaine rocks.

27. "Chicken" or "brick" is common slang for a kilogram of cocaine.

28. "Slippin'" is common slang meaning to be unaware or to let your guard down.

29. "To eat" is common slang for making money, usually by illegal means.

30. Within these gangs, there is an informal structure including "shotcallers" or leaders who have some perceived high level or leadership role within the group. "Shooters" or "hitters" are individuals who are perceived to be willing to act violently on behalf of themselves or the group. Other members are perceived as individuals who are committing criminal activity to make money, but not overtly proven to be willing to engage in violent acts. Youngsters are often very young individuals who may or may not actually be members, but who associate with the older members in various supportive ways. Associates or hang-arounds are individuals who may not be full members but who associate with the group and its members.

31. There is a "code of silence" which means that no one cooperates and testifies for the police.

32. Gang members do not cooperate with the police, they are expected to settle their differences between themselves.

33. Anyone who breaks the code of silence can be killed. "Fucks with the police" is common slang for cooperating or providing information to law enforcement. Similarly, to "fuck with" someone is common slang that can mean a willingness to work with or do business with someone, depending on the context in which it is said.

34. Acts of violence warrant respect within the group and with other groups. Even acts of violence that may be detrimental to the group as a whole can enhance the standing of the individual actor within the group and the individual actor as well as the group with other groups.

35. Acts of violence can generate different levels of respect

4

depending upon the situation. Acts of violence against fellow gang members or unaffiliated individuals for perceived disrespect or to gain an advantage can enhance the actor's status. Acts of violence against rival gangs at any time, or against different gang members for perceived disrespect or to gain an advantage are far more likely to enhance the actor's status. Acts of violence against perceived "snitches" or against law enforcement are most likely to enhance the actor's status. Acts of violence against uninvolved civilians or uninvolved family members of gangsters without provocation or potential profit are less likely to enhance the actor's status and may result in a loss of status.

36. Disrespect to an individual gang member or to the group has to be dealt with or else the individual and the group lose respect. Acting against that disrespect, sometimes through violence, enhances an individual's standing within the group and with other groups. Failure to act against disrespect, even in an individual capacity, causes an individual to lose standing within the group and with other groups.

37. Similarly, disrespect to the associates, family members, and close friends of the members of the group has to be dealt with or else the individual and the group lose respect. Acting against that disrespect, sometimes through violence, enhances an individual's standing within the group and with other groups. Failure to act against that disrespect causes the individual and the group to lose standing.

38. Making money through any illegal means is likely to enhance status within the group and with other groups. Among the common methods of making money are narcotics sales, robberies, murder for hire, burglaries of dwellings and automobiles, dealing in stolen goods, identity theft, access device fraud, pimping, and other illegal activities. "Sliders" is a common slang term for illegal and fraudulent credit cards.

39. Interference with a member's ability to make money can be perceived as disrespect to that individual within the group and with other groups. Acts of violence committed as retaliation or to improve the ability of a member or the group to make money can enhance status within the group and with other groups.

40. Acts of violence can be committed against rival groups, to protect or enhance territory, to protect or enhance money making opportunities, or because of perceived disrespect.

41. Time in jail and/or prison does not terminate membership in a gang. While incarcerated, gang members are generally grouped together with individuals from the same or similar gangs. Within jails and prisons, the gang affiliations can persist for protection and associations during incarceration.

42. Accepting a sentence of incarceration without cooperating against other members of the group provides some respect for the sentenced member of the group. Upon release, other members of the group are expected to provide some assistance to the member who

5

> has been incarcerated.
>
> 43. Lower level members, younger members, and members of the group without a significant criminal history who admit to crimes committed by older members or members with more significant criminal history are treated with respect for doing that. A common slang term for that activity is "taking a case."

Dkt. No. 858.

Defendant Antonio Gilton responded by moving to strike the majority of these opinions (numbers 3 through 12, part of 13, 15, 18, and 30 through 43) as beyond the scope of the Prior Order and/or inadmissible as expert testimony. *See* Dkt. No. 869. Sgt. Jackson then testified at a *Daubert* hearing on February 12 and 16, 2016. Dkt. Nos. 882, 883. The parties submitted additional briefing following the hearing. Dkt. Nos. 889, 901.

**LEGAL STANDARD**

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). With respect to when expert testimony will assist the trier of fact, the advisory committee notes for Rule 702 "refer to the traditional common law rule that expert testimony is called for when the 'untrained layman' would be unable intelligently to determine 'the particular issue' in the absence of guidance from an expert." *United States v. Mejia*, 545 F.3d 179, 189 (2d Cir. 2008); *see also*

Fed. R. Evid. 702 advisory committee notes ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). In addressing gang expert testimony offered for impeachment purposes, the Ninth Circuit has stated that "[t]he *Daubert* factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

**DISCUSSION**

Sgt. Jackson began his career as an SFPD officer in 2001. Dkt. No. 858 at p. 5. In 2003, he was assigned to patrol in the Western Addition out of the Northern Station. Tr. at 24. With the exception of two years on the Violence Reduction Team working throughout San Francisco, and approximately six months with the Tenderloin Special Investigations Team, he has been assigned to work in the Western Addition ever since, including two stints as a member of the SFPD Gang Task Force, once from 2007 to 2010 and again from 2013 to the present. Tr. at 24, 34, 36-38. While focusing more on gangs in the Northern District rather than the Park District, where CDP is located, he has been aware of and has investigated criminal activity involving alleged CDP members since he was first assigned to patrol in the Western Addition. Tr. at 182.

Sgt. Jackson does not consider himself a gang expert except regarding the African American gangs in the Western Addition. Tr. at 147-49. He gained his expertise on the job,

7

investigating cases, talking with citizens, victims, informants, alleged perpetrators, and fellow officers, as well as doing various types of surveillance, including listening to wiretaps and jail calls.

Sgt. Jackson's opinions regarding CDP and other Western Addition gangs cover six basic topics: (1) common slang; (2) gang territory; (3) gang symbols; (4) gang alliances and rivalries; (5) general characteristics of gangs, including common values and behaviors; and (6) use of rap music. Sgt. Jackson's knowledge and experience qualify him to give expert testimony that will be helpful to jurors on the first three topics, but for a variety of reasons he is precluded from giving opinions on the latter three.

The government argues that restricting gang expert testimony in the way that I indicated in my tentative, and confirm here, is unusual in this district. The government is mistaken. While one of my colleagues allowed the type of broad-ranging gang expert testimony that the government seeks to introduce, *see United States v. Cyrus*, No. 05-cr-00324-MMC, others have been more skeptical about the admissibility of such evidence, *see United States v. Cervantes*, No. 12-cr-00792-YGR, Dkt. No. 928 (Feb. 9, 2016); *United States v. Flores*, No. 12-cr-00119-SI, Dkt. No. 1085 (Jun. 16, 2014); *United States v. Ablett*, No. 09-cr-00749-RS, Dkt. No. 175 (Sep. 12, 2011); *United States v. Cerna*, No. 08-cr-00730-WHA, Dkt. No. 2781 (Dec. 17, 2010). Two days of testimony from Sgt. Jackson at the *Daubert* hearing underscored the telescoped nature of his expertise (gained on the job in the Western Addition) and the impossibility of testing its reliability on many topics because of its dependence on information gleaned from unidentified gang members and citizens, confidential informants, and open investigations. The government needs to prove the existence of a criminal enterprise and the violent crimes committed on its behalf on the basis of evidence from lay witnesses, not through the opinions of a police officer who has spent most of his career, among other things, investigating people in the group against whom this case is brought.

**I.   COMMON SLANG**

To the extent that they are relevant and not unduly prejudicial, Sgt. Jackson may give his opinions regarding common slang. This includes opinions 20 through 29, opinion 4 insofar as it

8

1   concerns the meaning of "chopper" or "chop," opinion 30 insofar as it concerns the meaning of

2   "shotcallers," "shooters," and "hitters," opinion 33 insofar as it concerns the meaning of "to fuck

3   with" either the police or another individual, opinion 38 insofar as it concerns the meaning of

4   "sliders," and opinion 43 insofar as it concerns the meaning of "taking a case." Defendants may

5   object to these opinions on relevance and/or undue prejudice grounds at trial. In ruling on such

6   objections, if any, I will be particularly interested in how the jury will be exposed to the particular

7   slang term through the other evidence at trial.

**II.   GANG TERRITORY**

Sgt. Jackson may give his opinions on the existence of the various gangs in the Western Addition and their respective territories. His extensive experience working in the Western Addition and on the Gang Task Force forms a reliable basis for this testimony. This includes opinions 1 through 5, the first two sentences of opinion 6, and opinions 8 and 9.[3]

**III.   GANG SYMBOLS**

Sgt. Jackson's extensive experience also provides a reliable basis for his opinions that "'Uptown' and 'Downtown' gangs used a variety of symbols, including certain hand signals, codes, and tattoos," and that the symbols may appear "in a variety of contexts, including email addresses, online monikers, rap songs, and graffiti or 'tags,' as well as in coded communications." Dkt. No. 858 ¶ 13. In addition, he may give his opinions regarding the hand signals used for "Uptown" and "Downtown" (i.e., opinions 14 and 15).

Sgt. Jackson may not provide expert testimony regarding opinions 16 through 19. I recognize that prior to the *Daubert* hearing, my tentative indicated that Sgt. Jackson would be allowed to give these opinions. But in light of the evidence presented at the hearing, I do not think that the opinions are sufficiently reliable, or sufficiently helpful to the jury, to be admitted at trial. Sgt. Jackson may be able to testify regarding some of the subject matter of opinions 16 through 19, but he will have to do so as a fact witness, subject to the limitations on fact-witness testimony.

---

[3] At the hearing, there was some discussion about Sgt. Jackson's opinion that "D-Block" is an alternate name for CDP. *See* Tr. at 305-06, 323-24. Sgt. Jackson did not establish a reliable basis for this opinion, which in any event is not included in the Supplemental Notice (opinion 2 references the meaning of "D" but not of "D-Block"). *See* Dkt. No. 858 ¶ 2.

Opinion 16 states that "[a] hand signal with cupped hand or hands was used to symbolize CDP." Dkt. No. 858 ¶ 16. Sgt. Jackson testified that he reached this opinion by speaking with Western Addition gang members and citizens as well as with other police officers, and by seeing the hand signal in videos and photographs.[4] Tr. at 87-89. He did not explain, even in general terms, how many or which gang members, citizens, or police officers he spoke with in reaching the opinion, or what information those individuals conveyed to him.[5] Nor did he provide additional information regarding the videos in which he has seen the hand signal. Further, he could not recall a single time that he has seen the hand signal while on patrol or on the street. Tr. at 224-25. The only specific information underlying opinion 16 identified by Sgt. Jackson at the hearing was a series of photographs, each of which include one or more alleged CDP members making the hand signal. When asked on cross examination how he corroborated his opinion that the hand signal means CDP, he stated, "Because the only individuals that I've seen . . . doing that in these photos are all associated with the area around Central and Divisadero." Tr. at 225-26.

This testimony does not provide a reliable basis for opinion 16. The general reference to unidentified gang members, citizens, other police officers, and videos, without any specific information about these sources, is far too vague to make the opinion reliable. *See Cervantes*, No. 12-cr-00792-YGR, Dkt. No. 928 at 15 ("The specificity with which each expert seeks to opine combined with the failure to explain his reasoning or analysis, or to distinguish among the sources on which he relied, lead the Court to find that the opinions . . . are not admissible."); *Cerna*, No. 08-cr-00730-WHA, Dkt. No. 2781 at 11 ("[The expert] testified that the basis for this opinion was his 'training and experience,' 'conversations with other officers,' and 'reviewing documentaries.' This description is so general that it is impossible to tell how the . . . opinion was extrapolated, much less whether it was properly extrapolated."); *see also United States v. Hermanek*, 289 F.3d

---

[4] To be clear, Sgt. Jackson testified that these sources were the basis for opinions 14 and 15, regarding the hand signals for "Uptown" and "Downtown." Tr. at 87-88. He then stated that he relied on "the same" sources as the basis for opinion 16. *Id.*

[5] Sgt. Jackson's failure to identify what information he was told about the "CDP" hand signal contrasts with his *Daubert* testimony about the "Uptown" hand signal. He specifically stated that he was told that two thumbs up with the fists connected is a symbol for "Uptown." Tr. at 220.

10

1076, 1094 (9th Cir. 2002) (finding an expert's opinions on the meaning of certain terms unreliable where "[t]he factors [the expert] identified [as the basis for his opinions] – his knowledge and prior investigation of defendants and the 'evidence seized' in the case – were too vague and generalized to satisfy the requirements of Rule 702").

The photographs presented at the hearing are also insufficient. Sgt. Jackson's logic appears to be that because there exist photographs in which alleged CDP members make the hand signal, the hand signal must "symbolize CDP." At best, however, the photographs merely indicate (as Sgt. Jackson himself put it at the hearing) that certain CDP members "associate with that symbol for whatever reason." Tr. at 225. The idea that certain CDP members "associate" with a particular hand signal is substantially different from the idea that the hand signal "symbolizes" CDP. Sgt. Jackson's testimony at the hearing might provide a reliable basis for the former opinion, but it does not do so for the latter. And even assuming that expert testimony from Sgt. Jackson that CDP members "associate" with the hand signal would be reliable, it would not be helpful to the jury. That is an inference that the jury is equally capable of reaching on its own based on ordinary fact-witness testimony, in particular with the aid of Sgt. Jackson's expert opinion regarding the general use of symbols by Western Addition gangs (i.e., opinion 13). Apart from that opinion, Sgt. Jackson's *Daubert* testimony did not reveal anything else about his knowledge or experience that an untrained layman would require to determine intelligently whether the photographs establish that "[a] hand signal with cupped hand or hands" means CDP.

Opinions 17 and 18 concern the numerical sequences allegedly used for CDP ("237"), KOP ("567"), Chopper City ("223"), Page Street ("778"), and Turkwood ("894"). These opinions also lack reliability.

Sgt. Jackson stated that he has seen the "237," "567," and "223" codes "in photos, social media, profile names, [and] pictures," and that he has spoken with informants about them. Tr. at 89. With respect to the "778" code for Page Street, he stated only, "I can't recall where I've witnessed that one right now." *Id.* With respect to the "894" code for Turkwood, he stated only, "I have not seen as many instances of 894/Turkwood except for in a picture, which was generated by an unknown subject, which had 894/Turkwood." *Id.*

11

Sgt. Jackson's opinions regarding "778" and "894" are plainly unreliable and/or unhelpful to the jury. He identified no basis whatsoever for his opinion regarding "778." With respect to "894," the picture in which Sgt. Jackson stated that he saw the "894" code is a drawing retrieved during a 2007 traffic stop of a suspected CDP member. Tr. at 298. He has never asked any gang member or informant about the drawing, does not know who made it, and was not involved in the traffic stop. Tr. at 322-23. To the extent that the drawing supports the inference that "894" is code for Turkwood, the jury can make the inference for itself.

The opinions regarding "567" for KOP and "223" for Chopper City are only slightly better supported. Sgt. Jackson offered no basis for his opinions regarding "567" and "223" except for the drawing retrieved from the 2007 traffic stop discussed above, and the general reference to unidentified photos, social media, profile names, pictures, and informants. The drawing does not provide an adequate basis for admitting the opinions at trial. The general reference to unidentified photos, social media, profile names, pictures, and informants, without any description of what those sources consisted of or what particular information they conveyed, also fails to make the opinions reliable, because it cannot be cross examined.

In addition to the drawing, to support his opinion regarding the "237" code for CDP Sgt. Jackson pointed to a photograph of a sweatshirt that had "Divisadero," "Uptown," "CDP," and "237," on it. Tr. at 93-94. He testified that the photograph was taken in 2006 when an individual wearing the sweatshirt allowed Gang Task Force officers to take a picture of the sweatshirt without him in it. *Id.* Sgt. Jackson further testified that he could identify two individuals associated with CDP, neither of whom is a defendant in this case, who use "237" in their email addresses. Tr. at 230. These scattered references to "237" add some support for Sgt. Jackson's opinion on its meaning, but they are not sufficient to make the opinion reliable expert testimony.

Finally, opinion 19 defines "Banga" as "a slang term frequently identified with and/or used in reference to CDP members." Dkt. No. 858 ¶ 19. Sgt. Jackson testified that the basis for this opinion is that "[t]here are numerous individuals who in their jail classification photos and/or arrest photos have the word 'Banga' tattooed on them," and that all of these individuals "are

12

associated with CDP." Tr. at 101.[6] He subsequently identified five alleged CDP members, some of them defendants in this case, with "Banga" tattoos. Tr. at 231. Again, to the extent that the existence of the "Banga" tattoos supports the inference that the term "Banga" is "frequently identified with and/or used in reference to CDP members," the jury does not require expert testimony from Sgt. Jackson to make that inference.

That gang expert testimony on symbols, code words, and the like has generally been admitted in this district does not mean that it is admissible irrespective of its reliability or helpfulness to the jury. If Sgt. Jackson testifies at trial regarding the subject matter of opinions 16 through 19, he will do so as a fact witness.

## IV.  GANG ALLIANCES AND RIVALRIES

Sgt. Jackson may not give his opinions regarding the history of alliances and rivalries among Western Addition gangs. This includes the third and fourth sentences of opinion 6, opinion 7, and opinions 10 through 12.

As an initial matter, these opinions are beyond the scope of the Prior Order, which limited Sgt. Jackson to testimony regarding symbols, code words, colors, tattoos, territory mapping, and possibly also "characteristics of gangs in general . . . that would be helpful background for jurors." Prior Order at 3. Opinions regarding gang alliances and rivalries fit into none of these categories.

Further, the alliances and rivalries Sgt. Jackson seeks to describe appear to be central factual issues with respect to many of the charges against defendants, including, for example, the murder in aid of racketeering charges against defendants Reginald Elmore, Charles Heard, and Jaquain Young for the murders of Andre and Jelvon Helton. The Second Circuit's observations in *United States v. Mejia*, which I also quoted in the Prior Order, apply with special force here:

> [J]ust as an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group, law enforcement officers may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations. Officers interact with members of the organization, study its operations, and exchange information

---

[6] On redirect, Sgt. Jackson also stated in passing that CDP members or associates use the term "Banga" when "speaking about each other on social media." Tr. at 307. But he provided no specific examples and did not state in what context or with what frequency he has seen this occur.

13

> with other officers. As a result, they are able to break through the group's antipathy toward outsiders and gain valuable knowledge about its parochial practices and insular lexicon. Allowing law enforcement officers to act as experts in cases involving these oft-impenetrable criminal organizations thus responds to the same concerns that animated the enactment of the criminal laws that such organizations (and their members) are typically charged with violating . . .
>
> Yet despite the utility of, and need for, expertise of this sort, its use must be limited to those issues where sociological knowledge is appropriate. *An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," . . . the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them. The officer expert transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.*
>
> In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict – even more so when that expert happens to be one of the Government's own investigators. Any effective law enforcement agency will necessarily develop expertise on the criminal organizations it investigates, but the primary value of that expertise is in facilitating the agency's gathering of evidence, identification of targets for prosecution, and proving guilt at the subsequent trial. When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense.

545 F.3d at 190-91 (internal citations omitted; emphasis added). Sgt. Jackson's proffered testimony on gang alliances and rivalries is that of a "chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt," not that of a "sociologist describing the inner workings of a closed community." *Id.*

Finally, there are additional reliability problems with most if not all of Sgt. Jackson's opinions on gang alliances and rivalries. He repeatedly failed to provide examples of the specific

14

information on which these opinions are based, either because "the information [he] was provided involved investigations that are still open," Tr. at 210; *see also, e.g.,* Tr. at 214, or because he simply "didn't know what to give . . . for specifics," Tr. at 214. The information he did provide consisted largely of general references to unspecified information gleaned either from unidentified "individuals in the community" or from confidential informants, without any account of what that information was or when or how it was obtained. *See, e.g.,* Tr. at 300 (referencing "informants and confidential sources"); Tr. at 301 (referencing "informant information provided to the FBI"); Tr. at 328 (same). These sources are so vague, and so impervious to cross examination, that it is impossible to effectively test Sgt. Jackson's reliance on them.

## V. GENERAL CHARACTERISTICS OF GANGS

Opinions 30 through 43 concern the general characteristics of Western Addition gangs, including certain common values and behaviors. *See* Dkt. No. 858 ¶¶ 30-43. The opinions are focused largely on the circumstances that typically drive gang members to commit acts of violence or other crimes, and the types of crimes they typically commit. *See id.*

With the exception of the portions regarding common slang discussed above, opinions 30 through 43 are not admissible. Many if not most of the opinions are not helpful to the jury. Jurors do not need to be told, for example, that "interference with a [gang] member's ability to make money can be perceived as disrespect to that individual," that gang members do not cooperate with the police and may harm those who do, or that "[a]cts of violence can be committed against rival groups, to protect or enhance territory, to protect or enhance money making opportunities, or because of perceived disrespect." *Id.* ¶¶ 32, 39, 40. Most jurors will arrive to court with a general understanding of how different human behaviors can engender either respect or offense in others, and the dynamics of respect and disrespect described by Sgt. Jackson are not so idiosyncratic as to require specialized knowledge or experience to understand them. *See Cerna*, No. 08-cr-00730-WHA, Dkt. No. 2781 at 20 ("A jury does not need an expert's assistance to understand that . . . 'respect within the gang' can be gained through 'courage and ruthlessness.'"). Most jurors "will [also] know – whether from television or movies, or from reading news reports – that rival gangs

fight . . . and that they dislike 'snitches.'"[7] *Flores*, No. 12-cr-00119-SI, Dkt. No. 1085 at 2. Where the government requires evidence of the motivations underlying criminal acts committed by defendants or other individuals, the government can elicit that evidence through fact witnesses. *See id.* ("[P]ercipient witnesses can testify that they committed acts of violence to enhance the gang's standing . . . and their standing within the gang.").

The jury also does not need expert testimony to understand the structure of Western Addition gangs or the acts of violence and types of crimes they typically commit. In *United States v. Cerna*, Judge Alsup excluded proposed gang expert testimony regarding the structure, organization, and operations of MS-13 where,

> [u]nlike other cases that have allowed structure testimony, [the gang expert's] proffered opinions do not concern an elaborate money laundering or drug trafficking scheme. The structure here was simple. The racketeering acts were straightforward. No expert testimony is needed for a layperson to understand the alleged structure and organization of MS-13.

*Cerna*, No. 08-cr-00730-WHA, Dkt. No. 2781 at 8. There is even less need for expert testimony here, where CDP is not alleged to be part of a larger gang and the structure and criminal activities described by Sgt. Jackson are particularly simple and straightforward. As in *Cerna*, these aspects of the government's case are "amenable to ordinary fact proof of the type ordinarily understood by juries without the need for specialized police opinions." *Id.* at 5.

Most of opinions 30 through 43 are additionally inadmissible under Federal Rule of Evidence 403. Given that the opinions do not concern CDP specifically, but rather Western Addition gangs in general, their probative value is limited at best. Yet the danger of unfair prejudice from the opinions is extremely high. The opinions include repeated references to violent acts, without offering any specific proof that members of CDP (or of any other gang, for that matter) actually committed such acts. While the opinions are ostensibly directed at Western Addition gangs in general, they will be readily understood by the jury as applying to CDP – presumably, that is why the opinions are being offered. Judge Alsup's reasoning in *Cerna* is again

---

[7] Indeed, Sgt. Jackson conceded on cross-examination that his opinions regarding the "code of silence" allegedly enforced by Western Addition gangs is "pretty much stating the obvious." Tr. at 242-43.

instructive: whatever meaningful probative value can be drawn from the opinions is substantially outweighed by the danger that they will engender the conclusion – without any specific evidence of specific violent acts – that being a member of CDP means being a violent criminal. *See id.* at 17. This would allow the government to prosecute much of this case by "simple syllogism:"

> [F]irst, through expert opinion, the government would show [CDP] was a violent racketeering organization. Second, the government would show any given defendant was a member or associate of [CDP]. In this way, no more fact evidence than a few tattoos would be necessary to convict all accused.

*Id.* at 5. Violence and violent acts will certainly be admissible at trial, but they "ought to be proved up through actual fact evidence, not through police opinion testimony." *Id.* at 22.

There are also significant reliability problems with opinions 30 through 43. The *ipse dixit* nature of the vast majority of the opinions (because Sgt. Jackson cannot identify particular citizens or confidential informants or discuss ongoing investigation, and/or because he could not think of any specific information underlying the opinions at the hearing) means that they cannot be effectively tested through cross-examination. Further, Sgt. Jackson testified that Western Addition gangs can be "drastically different" from one another, s*ee* Tr. at 154-55, and that the bulk of his experience concerns gangs other than CDP. Even assuming that opinions 30 through 43 are reliable as applied to some Western Addition gangs, the extent to which they are reliable as applied to CDP is highly unclear.

## VI. USE OF RAP MUSIC

Opinion 13 states in relevant part, "'Uptown' and 'Downtown' gangs commonly used rap music as a way of communicating messages to each other and to rivals (for example to brag about past exploits or issue threats, particularly when certain gangs were 'beefing,' or in conflict with each other)." Dkt. No. 258 ¶ 13.

This opinion is inadmissible because it is unreliable, unhelpful to the jury, or both. Sgt. Jackson testified that he has personally observed numerous rap videos and audio recordings on the internet in which individuals, e.g., "speak[] about incidents that ha[ve] occurred," "talk about . . . friends of theirs in the gang who have been murdered," "call out other gang members," "flash guns . . . in a threatening manner," "mak[e] fun of the fact that the other gang's member died," and

17

use gang symbols. Tr. at 86-87, 215. This testimony does not support opinion 13, which is focused not on the content of the rap music at issue, but rather on its purpose (i.e., "communicating messages" to other gang members). While Sgt. Jackson provided considerable detail regarding the content of the rap music he has observed, he did not provide a reliable basis for his conclusion regarding the purpose of that music.[8] To the extent that the relevant videos or audio recordings support this inference, the government has not shown that the jury requires Sgt. Jackson's expertise to make it.

## CONCLUSION

Sgt. Jackson's testimony at trial shall be consistent with this Order.[9]

**IT IS SO ORDERED**.

Dated: March 9, 2016

WILLIAM H. ORRICK
United States District Judge

---

[8] The closest Sgt. Jackson came to discussing the purpose of the rap music was when he stated that he once had a conversation with members of Eddy Rock regarding

> the message that was being sent [by certain rap videos]. If they believed that the inflammatory comments directed towards other individuals was smart as opposed to just rapping based on skill. And that's what the conversation was about. As opposed to what they call battle rap, why not just rap based on skill, and talk about something else rather than killing somebody or a beef or disrespecting somebody else, because it brings violence; stuff like that brings violence to the neighborhood.

Tr. at 216. Even read generously, this testimony does not meaningfully support the conclusion that Western Addition gang members "used rap music as a way of communicating messages to each other and to rivals." Dkt. No. 258 ¶ 13. This is particularly so given that the conversation was with members of only one gang, and Sgt. Jackson explicitly stated that the conversation was not with the people who actually appeared in the relevant videos. *See id*.

[9] At the *Daubert* hearing, the defense marked for identification one state and one federal manual concerning gang prosecutions and criminal investigations. *See* Dkt. No. 890. There was no foundation laid for the admission of the manuals, and they were not admitted. *See id.* Defendant Alfonzo Williams's request, filed nearly two weeks after the hearing, that I take judicial notice of the manuals is DENIED. *See* Dkt. No. 903. His request that I take judicial notice of additional documents that were not even presented at the hearing is also DENIED. *Id.* His motion for joinder, Dkt. No. 904, is GRANTED.

18