DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
STEPHEN MEYER (CABN 263954)
PHILIP KOPCZYNSKI (NYBN 4627741)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    kevin.barry@usdoj.gov
    stephen.meyer@usdoj.gov
    philip.kopczynski@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR 13-764 WHO |
| Plaintiff, | ) |
| v. | ) **UNITED STATES' OPPOSITION TO REGINALD ELMORE'S MOTION TO EXCLUDE OPINIONS OF SERI FORENSIC SEROLOGIST PHILLIP HOPPER REGARDING DNA EVIDENCE (DKT. 2008)** |
| ALFONZO WILLIAMS, et al., | ) |
| Defendants. | ) |

OPP'N TO DNA MOT.
CR 13-764 WHO

Defendant Reginald Elmore seeks to exclude the expert opinion of forensic serologist Phillip Hopper regarding the likelihood that Elmore contributed to a DNA sample taken from the car in which Isiah Turner and Andre Helton were murdered. The thrust of Elmore's challenge is that the sample might have been a mixture of five contributors, and that the software used by Hopper in reaching his conclusion was not validated for five-person mixtures, so Hopper's conclusion is inadmissible under Federal Rule of Evidence 702. Elmore also claims that the way Hopper will express his opinion—which is in terms of a likelihood ratio—is misleading and confusing for the jury, so it should be excluded under Federal Rule of Evidence 403. All of Elmore's claims are unavailing. His motion should be denied.

## BACKGROUND[1]

In 2010, the government retained Serological Research Institute ("SERI") to analyze a number of DNA samples taken from the scene of the double murder of Turner and Helton. Dkt. 2008-1 at 2. One of the samples consisted of two swabs taken from the right (passenger side) rear door handle of the car in which the victims died. *Id*. This sample is of interest because other evidence, including the testimony of a cooperating witness, shows that defendants Charles Heard and Reginald Elmore were responsible for these murders, and that Elmore was the one who pulled the trigger while sitting in the right rear seat.

Gary Harmor at SERI performed the analysis. Dkt. 2008-1. He used the Identifiler Plus amplification kit to amplify the extracted DNA. Harmor Decl. ¶ 3. Identifiler Plus amplifies 15 loci. *Id*. After amplification and the other steps of his analysis, Harmor reached the following conclusion about the sample from the right rear door handle, as documented in a 2012 report:

> The genetic marker profile obtained from the DNA on the swabs from the right door handle #11-11 (item 2-1) is mixture of DNA from at least five individuals. The major donor is, in my opinion, Isiah Turner. Andre Helton and Reginald Elmore could be possible minor donors. Approximately two persons in three could also be a minor contributor considering Andre Helton's genetic profile and approximately four in seven persons could also be a minor contributor considering Reginald Elmore's genetic profile.

Dkt. 2008-1 at 9.

---

[1] Numerous prior filings have addressed the fundamentals of forensic DNA analysis, *see, e.g.*, Dkt. 753, and the Court is clearly fluent in these concepts, *see, e.g.*, Dkt. 1252, so the government does not repeat them here.

OPP'N TO DNA MOT.
CR 13-764 WHO                                                         1

1    In 2016, SERI validated and began using a newer amplification kit called GlobalFiler. Hopper Decl. ¶ 6. GlobalFiler amplifies 24 loci. *Id*. It adds several highly polymorphic loci to the set of loci amplified by earlier kits, such as Identifiler Plus. *Id.* ¶ 7. A highly polymorphic locus is one at which the population at large has a great variety of alleles, and thus the particular alleles present at that locus in an evidence sample may better distinguish among possible contributors. *Id.*

In March 2018, Heard was convicted at trial for the murders of Turner and Helton. Dkt. 1765. Elmore, who requested—and was granted—severance from the first trial group over the government's objection, Dkt. 1409, will stand trial beginning next month, Dkt. 1992.

In April 2018, SERI internally validated the use of probabilistic genotyping software called Bullet. Hopper Decl. ¶ 14. Bullet is available to forensic laboratories, including SERI, that participate in the eDNA Consortium. *Id.* ¶ 9. Bullet relies on several variables to calculate a likelihood ratio of two hypotheses, which usually relate to the inclusion or exclusion of a suspect. *Id.* ¶ 10–11. The variables that inform Bullet's calculation include, among others, the allele frequencies for different populations, such as African American, Asian, Caucasian, and Hispanic populations. *Id*. SERI validated Bullet for use with two-, three-, and four-person mixtures, concluding that Bullet "is robust and appropriate for the statistical interpretation of complex mixtures." *Id.* ¶ 14; *see also* Dkt. 2008-4 (SERI's "eDNA Bullet Internal Validation Summary").

Also in April 2018, the government retained SERI to re-test several items of evidence related to the double murder, including the swabs from the right rear door handle. Dkt. 2008-3. Phillip Hopper at SERI performed the analysis. Hopper Decl. ¶ 16. He used the GlobalFiler amplification kit to amplify the extracted DNA. *Id.* ¶ 18. Later in the process, using Bullet, he calculated likelihood ratios with respect to the right rear door handle sample. *Id.* ¶ 27. His conclusions were as follows:

> DNA recovered from the Right Door Handle Swabs (items 2-1 and 2-2) is a mixture of at least four contributors with at least one male contributor. Assuming four contributors, the DNA evidence is at least 18 billion times more likely to have arisen from Isiah [Turner] (item 15) and three unknown, unrelated individuals rather than four unknown, unrelated individuals. This likelihood ratio provides extremely strong support for the inclusion of Isiah [Turner] to the mixture from this item.
>
> Assuming Isiah [Turner] is a contributor to this mixture, the DNA evidence is at least 270 thousand times more likely to have arisen from Isiah [Turner], Reginald Elmore (item 21 A-1 ), and two unknown, unrelated individuals than Isiah [Turner] and three unknown, unrelated

|   |   |
|---|---|
| 1 | individuals.  This likelihood ratio provides very strong support for the inclusion of Reginald Elmore to the mixture from this item.  Charles Heard (item 17 A-1) is excluded as a contributor to the mixture. |
| 2 | |

Dkt. 2008-2 at 9.

After Elmore filed the instant motion, Harmor re-reviewed his 2012 report and the underlying analysis. Harmor Decl. ¶ 5. He concluded that his statement in his report that the DNA evidence from the right rear door handle is a mixture of at least five contributors is a mistake. *Id.* ¶ 6. He believes the electropherogram and other data indicate that the mixture has at least four contributors, not five. *Id*.

## ARGUMENT

### I.     Hopper's Testimony is Admissible Under Rule 702

#### A.     Applicable Law

In the context of scientific testing, such as forensic DNA analysis, the pertinent question under the Federal Rules of Evidence and the *Daubert* line of cases is whether the principles and methods that generated the expert's data are grounded in "good science." *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 593 (1993).  A district court faced with a *Daubert* challenge to expert scientific testimony "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1316 (9th Cir. 1995).  Put differently, the focus is on the expert's "methodology, not the conclusion to which the evidence would lead." *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010).  "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car v. Avis Budget Group*, 738 F.3d 960, 969–70 (9th Cir. 2013).

Federal Rule of Evidence 702 elaborates on these principles by providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Court's role when considering testimony offered under Rule 702 is to act as a "gatekeeper," ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  Assessing reliability "entails a preliminary assessment of whether the reasoning and methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.  The Court may consider whether the technique can be and has been tested; whether the technique has been subjected to peer review; the known or potential error rate and the existence of standards controlling the technique's operation; and whether the technique is generally accepted.  *Id.* at 593–94.  These factors are not "definitive," *id.* at 593, and the "trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

**B.    Hopper's Methods Were Reliable**

Hopper's testimony is admissible.  He used reliable methods to calculate a likelihood ratio related to the probability of Elmore's inclusion in the sample from the right rear door handle.  SERI is an accredited laboratory that has validated the key components of the analysis, including the amplification kit, GlobalFiler, and the probabilistic genotyping software, Bullet.

Elmore's attack on Hopper's analysis is unavailing.  To begin, it is important to emphasize what Elmore's motion is not.  He is not challenging the reliability of Bullet or probabilistic genotyping software generally.  Indeed, he hardly could.  Numerous federal and state courts in recent years have rejected *Daubert* and *Frye* challenges to the admission of probabilistic genotyping evidence, recognizing that it is widely used and reliable.  *See, e.g.*, *United States v. Christensen*, No. 17-CR-20037 JES, 2019 WL 651500 (C.D. Ill. Feb. 15, 2019); *United States v. Jones*, No. 15-CR-153 VSB, 2018 WL 2684101 (S.D.N.Y. June 5, 2018); *United States v. Russell*, No. CR-14-2563 MCA, 2018 WL 7286831 (D.N.M. Jan. 10, 2018); *United States v. Pettway*, No. 12-CR-103S WMS, 2016 WL 6134493 (W.D.N.Y. Oct. 21, 2016); *People v. Muhammad*, No. 338300, 2018 WL 4927094 (Mich. Ct. App. Oct. 2, 2018); *People v. Bullard-Daniel*, 42 N.Y.S.3d 714 (N.Y. Co. Ct. 2016).  Instead, Elmore's challenge is a narrow one to the circumstances in which Bullet was used here.

In particular, Elmore criticizes Hopper's analysis by arguing that the tested sample was "most

likely" a mixture of "five contributors or more," not four, and that SERI has validated Bullet for use with four- but not five-person mixtures. Dkt. 2008 at 6, 15–18. This argument fails for four reasons.

First, Elmore latches onto the phrasing of Hopper's conclusion about the number of contributors to the sample in question, which is that it is "at least four." Dkt. 2008-2 at 9. According to an expert retained by Elmore, "It is important to note that in this context 'at least four individuals' does not mean 'four individuals' or even 'most likely four individuals.'" Dkt. 2008-5 at 4. But what Elmore and his expert fail to acknowledge is that in the real world, it is impossible to be certain of how many individuals contributed to a mixed DNA sample. Allele sharing, sample degradation, and other phenomena mean it is always possible—even if unlikely—that the number of contributors to a mixture apparent from forensic analysis is fewer than the true number. Hopper Decl. ¶ 24. Hopper's considered opinion is that the data give no indication that there are more than four contributors to the sample in question. Hopper Decl. ¶¶ 19–24. Nevertheless, because certainty is impossible, he prudently makes it his practice in every case to qualify his conclusion about the number of contributors with the "at least" language. Hopper Decl. ¶ 24.

Second, Elmore emphasizes that the prior SERI analyst who looked at the same sample, Harmor, wrote in his report that it is a mixture of at least five contributors. But the number of contributors, while indeed stated in Harmor's report, was not relevant to the statistical analysis he performed, and he now believes he made a mistake by saying it was five because simply was not focused on it. Harmor Decl. ¶ 6. Harmor re-reviewed the electropherogram from his old analysis, and he concluded that the mixture is from at least four individuals, not at least five individuals. *Id.* ¶¶ 5–6.

Third, Elmore and his expert point to studies reporting that forensic DNA analysts frequently underestimate known five- or six-person mixtures as originating from four contributors. Dkt. 2008 at 13; Dkt. 2008-5 at 5–6. Those studies are of limited relevance,[2] but even accepting their reported results

---

[2] One cited study is from 14 years ago, and involved testing of only 13 loci. Dkt. 2008-5 ¶ 12. The kit used in this case, GlobalFiler, amplifies 24 loci. Hopper Decl. ¶ 6. It is undisputed that testing more loci enhances accuracy. Another cited study, authored by Michael Coble and others, ignored peak height information. The heights of the peaks present on an electropheraogram may help determine the number of contributors. *See* Hopper Decl. ¶ 20. By the study authors' own admission, "ignoring [peak] heights would only serve to increase the probability of a higher order mixture presenting as one with fewer contributors." Coble, Michael, et al., *Uncertainty in the number of contributors in the proposed new CODIS set*, Forensic Sci. Int. Genet., Nov. 2015; *see also* Bright, Jo-Anne, et al., *Internal validation of STRmix – A multi laboratory response to PCAST*, Forensic Sci. Int'l: Genetics, May 2018 ("The

1  at face value, they do not support Elmore's conclusion. It is fallacious to say that, because there is a
2  high probability that a five- or six-person mixture would be misinterpreted as a four-person mixture, the
3  sample in this case is "most likely" a mixture of "five contributors or more." Dkt. 2008 at 6. In fact,
4  there is ample reason to conclude that the sample has four contributors and was correctly identified as
5  such. One study cited by Elmore reported that known four-person mixtures were correctly interpreted as
6  such in seventy-six percent of cases studied. Bright, Jo-Anne, et al., *Internal validation of STRmix – A*
7  *multi laboratory response to PCAST*, Forensic Sci. Int'l: Genetics, May 2018. SERI's internal
8  validation of the GlobalFiler kit demonstrated even more accurate results: all known four-person
9  samples were correctly identified as such. Hopper Decl. ¶ 8.[3] Thus, while the statistics cited by Elmore
10 show it is possible that the sample in question has five or more contributors, they certainly do not allow
11 him to claim the sample is "most likely" a mixture of "five contributors or more." Dkt. 2008 at 6.

12       Fourth, relying extensively on a law student note, among other sources, Elmore claims that "an
13 error in determining how many individuals' DNA were present within a mixture could have rippling
14 effects through subsequent stages of the analysis." Dkt. 2008 at 15–16 (internal quotation marks and
15 citation omitted). Elmore is overstating the significance of the number of contributors to the overall
16 calculation, and ignoring the fact that mistakes in this area most often benefit the suspect. Hopper has
17 tested how the likelihood ratio at issue changes if he assumes five contributors instead of four. Hopper
18 Decl. ¶ 31. The likelihood range decreases by an order of magnitude, but continues to provide very
19 strong support for the inclusion of Elmore. *Id.*[4] Likewise, SERI's internal validation study, as well as

---

Coble et al. experiment is valuable but does not take into account peak heights, and so the study does not reflect the information that peak heights provide analysts in their assignment of [the number of contributors."].

[3] Elmore and his expert point out that when SERI validated the GlobalFiler amplification kit, its analysts underestimated the number of contributors for the five-person samples in the test. Dkt. 2008 at 17; Dkt. 2008-5 ¶ 16. Elmore thus claims that "[t]he problem of underestimation is especially acute at SERI." Dkt. 2008 at 17. But this result of the validation study is not due to any shortcoming of SERI personnel or the GlobalFiler kit, but rather a quirk of the study. By coincidence, the contributors used to create the test mixtures shared alleles. Hopper Decl. ¶ 8. Given the genotypes of the contributors, no more than eight alleles could appear at any one locus. *Id.* As discussed elsewhere, allele sharing is always a possibility in any mixture sample, but there is no basis to claim that it is an "especially acute" possibility for samples tested by SERI.

[4] It is perhaps notable that the likelihood ratio goes down when assuming five contributors. If five were the correct number of contributors, and four were an underestimate, the expected result would be that the likelihood ratio goes up. That the ratio goes down may support the conclusion that four, not five, is the true number of contributors. In any case, the likelihood ratio provides very strong support for

OPP'N TO DNA MOT.
CR 13-764 WHO                                6

other sources (including studies of other probabilistic genotyping programs), show that mistakes in the number of contributors often do not dramatically change the likelihood ratios, and to the extent that the ratios change, they most often go down, which benefits suspects who are true contributors to the sample. *See* Hopper Decl. ¶ 32; Bright, Jo-Anne, et al., *Internal validation of STRmix – A multi laboratory response to PCAST*, Forensic Sci. Int'l: Genetics, May 2018 ("When assigning [the number of contributors], for false donors the only risk is overestimation . . . . With respect to the [likelihood ratio] for true donors, you are either correct or conservative when [the number of contributors] is either under or overestimated."); Buckleton, John, et al., *The Probabilistic Genotyping Software STRmix: Utility and Evidence for its Validity*, J. Forensic Sci., 2018 (summarizing studies that reached similar conclusions).

In sum, Elmore has given the Court no reason to question the reliability of Hopper's conclusions. Elmore's theory is that because SERI validated Bullet for four-person mixtures, SERI's analysts may reliably use Bullet only on samples that they can conclusively say are "from only four individuals." Dkt. 2008 at 18 (quoting Dkt. 2009-5 ¶ 18). But in the real world, it is never possible to conclusively determine the number of contributors to a mixture. If Elmore's position were correct, SERI could never use Bullet for any four-person mixture, despite having validated the program for that very type of mixture. Such a counterintuitive result is not compelled by the science or the law. Hopper has shown that his use of Bullet in this case was validated and reliable. To the extent it is possible that the sample in question is actually a mixture of five or more contributors, and thus Hopper underestimated the true number of contributors, Elmore can explore that topic on cross-examination. It is not a basis for excluding the evidence. *Cf. Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."); *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996) ("An allegation of failure to properly apply a scientific principle should provide the basis for exclusion of an expert opinion only if a reliable methodology was so altered as to skew the methodology itself." (internal quotation marks omitted)).

---

the inclusion of Elmore either way. Elmore can explore this topic on cross-examination if he wishes, but it provides no basis to exclude Hopper's testimony.

**II.      Hopper's Testimony is Admissible Under Rule 403**

Elmore also challenges Hopper's testimony under Federal Rule of Evidence 403, but here again, his arguments are unavailing.

First, Elmore argues that the concept of a likelihood ratio "is likely to mislead or confuse the jury." Dkt. 2008 at 20. While it is true that likelihood ratios require careful explanation, there is no reason to think the risk of confusion "substantially outweigh[s]" the probative value of this evidence. Fed. R. Evid. 403. If given appropriately detailed testimony, jurors are perfectly capable of understanding this concept, just as they are capable of understanding any number of other scientific or technical concepts that frequently arise in modern federal trials. As other courts have found when deciding to admit probabilistic genotyping evidence, "cross-examination at trial is the more appropriate avenue" for Elmore to press his criticisms of likelihood ratios as a statistical tool. *Jones*, 2018 WL 2684101, at *10.[5]

Second, Elmore argues that "the apparent precision of the likelihood ratio is misleading." Dkt. 2008 at 21. But any statistical evidence involves numbers, and there is nothing inherently "misleading" about numerical evidence. Moreover, the likelihood ratio reported by Hopper is a rounded number—270,000—which does not imply an unduly high level of "precision." As with the concept of a likelihood ratio, Elmore will be free to explore his concerns in this area on cross-examination.[6]

Third, Elmore argues that "the magnitude of the likelihood ratio [in his case] is impossible for laypeople to contextualize and evaluate." Dkt. 2008 at 22. To the extent Elmore is arguing that the evidence against him has to be excluded because it is so astronomically strong that the jury cannot comprehend its strength, his argument should be rejected out of hand. Alternatively, to the extent he is arguing that likelihood ratios are only useful if understood in conjunction with the concept of prior odds,

---

[5] Elmore claims in a footnote that Hopper's report expresses the concept of a likelihood ratio in an "incorrect" manner. Dkt. 2008 at 20 n.6. Hopper accepts this critique, and has agreed to reword his report to be as precise as possible. Hopper Decl. ¶ 29. His testimony at trial will track this revised wording.

[6] Relatedly, Elmore claims that "inherent variability within the Markov chain Monte Carlo algorithm means that the same software will not produce the same result when run multiple times on the same sample." Dkt. 2008 at 21. This is true of some probabilistic genotyping programs, but not Bullet, which does not employ a Markov chain Monte Carlo method. Hopper Decl. ¶ 12. With Bullet, the likelihood ratio is always the same given the same inputs. *Id*.

OPP'N TO DNA MOT.
CR 13-764 WHO                                                    8

he is simply rehashing his criticism of likelihood ratios. Careful and thorough direct testimony, and rigorous cross-examination, will address his concern.

Fourth, Elmore criticizes Hopper's opinion that the calculated likelihood ratio in this case provides very strong support for the proposition that Elmore is a contributor to the sample. That phrase—"very strong support"—comes from a verbal scale developed by SERI. Hopper Decl. ¶ 33. Elmore's criticism of the verbal scale is that it is "arbitrary" and inconsistent with the idea that "likelihood ratios do not purport to state the odds in favor of a particular hypothesis." Dkt. 2007 at 22. But while it is true that likelihood ratios do not express odds, likelihood ratios do express whether, given the other evidence, a hypothesis is relatively more or less likely. In forensic DNA analysis, a likelihood ratio of greater than 1 tends to suggest inclusion of the suspect, while a likelihood ration of less than 1 tends to suggest exclusion. Hopper Decl. ¶ 11. Using words to describe the strength of support provided by very high likelihood ratios is fully consistent with these concepts, and can help the jury evaluate the evidence.[7]

Fifth, Elmore argues that the jury cannot "competently reconcile two vastly different statistics arising from nearly identical analyses of the same DNA." Dkt. 2008 at 6. He similarly claims that Hopper's conclusion "appear[s] to be incompatible" and is "seemingly inconsistent" with Harmor's prior conclusion. Dkt. 2008 at 5, 23. But the simple explanation for the different results is many years passed between the two analyses, and the technology vastly improved in that time. Hopper performed his analysis with a new amplification kit that amplifies far more loci, and with probabilistic genotyping software that is very good at aiding in the interpretation of complex mixtures.

Finally, Elmore argues that "admitting Mr. Hopper's opinions would be much more prejudicial than probative" because Elmore "was not present at the scene of the murders and did not kill Turner or

---

[7] Elmore complains that Hopper did not describe SERI's entire verbal scale in his written report, Dkt. 2008 at 23 n.7, but Hopper will describe the entire scale in his trial testimony. In addition, citing a SWGDAM publication, Elmore claims that false inclusions very well could occur at likelihood ratios that would fall within SERI's "very strong support" category. *Id.* But what SWGDAM actually said is that false inclusions are "generally not expected" with likelihood ratios over 1,000,000, and are "most commonly observed" with likelihood ratios of between 2 and 99. SWGDAM, *Recommendations of the SWGDAM Ad Hoc Working Group on Genotyping Results Reported as Likelihood Ratios*, July 2018. A likelihood ratio of between 2 and 99, which SWGDAM recommends calling "Limited Support," *id.*, is below what SERI would describe as any kind of support. Hopper Decl. ¶ 33.

Helton." Dkt. 2008 at 24.  This argument requires no response, other than to say that ample evidence proves Elmore's guilt, and the government is confident that the jury will convict Elmore on all counts, as the jury in the first trial did with Heard.[8]

## CONCLUSION

For all these reasons, the Court should deny Elmore's motion.

Dated: April 3, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
KEVIN J. BARRY
STEPHEN MEYER
PHILIP KOPCZYNSKI
Assistant United States Attorneys

---

[8] Elmore briefly states in a footnote that he "preserves his right to object to" Hopper's testimony based on a review of Bullet's "source-code." Dkt. 2008 at 24 n.8.  The Court should find that any such objection is not preserved.  Elmore claims a "source-code review" would be "time-consuming and involved," *id.*, but he has known of the government's intention to offer this evidence for many months.  The Court should deem any objection not properly developed and argued in the instant motion waived.